No. 15.—McDonald, Bailey & Powers, *vs.* Leroy Napier. Leroy Napier *vs.* McDonald, Bailey & Powers.

[1.] A judgment was obtained by R. against N. which was afterwards reversed. Before its reversal, and before any proceedings were instituted to reverse it, the defendant, N., paid to the attorneys of the plaintiff, R., upon the judgment, three thousand dollars: *Held,* that after the reversal, the attorneys were not liable to N. for that money, although it still remained in their hands; but that he must resort to the plaintiff.

[2.] If money be paid to an agent, which the principal is not in law entitled to receive; or, if the agent exceeds his authority in receiving it; or, if it is paid to him by mistake, the agent is liable for it to the payer, so long as it remains in his hands, and his situation, relatively to his principal, is not altered as regards that fund; and he is in such cases liable, without notice not to pay it over; and if he has such notice, then he is liable, even if, afterwards, he does pay it over, or his situation is altered.

[3.] All acts done under a subsisting judgment, which is subsequently reversed, are valid, as respects the rights of third persons—the reversal is not retroactive, so as to make illegal, acts which were lawful at the time. Money received on a judgment which is subsequently reversed, is lawfully received; and the effect of the reversal is to give to the payer a right of action against the plaintiff, which before had no existence

[4.] If money is received by an attorney for the plaintiffs on a judgment, from the defendant, and a credit given therefor on the judgment, and by an understanding with the defendant, is applied by the attorney in payment of fees due to him by his client, it is equivalent to a payment over to his client, so far as to protect him from a suit by the defendant, when the judgment is subsequently reversed.

[5.] An attorney in England has a *general lien,* for the amount of his bill of costs and disbursements upon the deeds, papers and writings of his client, which come into his hands, in the course of his professional employment, although his demand does not arise from services in relation to those papers; and this lien extends to the general balance of his accounts with his client. This general lien is, however, only commensurate with the right which the party delivering the papers has in them.

[6.] He also has a special lien upon the money of his client, which may come into his hands; and upon a judgment obtained by him for his client, for the amount of his bill accruing in the case in which the money is received or the judgment obtained. If the money is in his hands, he may retain it, in payment of his bill; and if in the hands of the Court, it will hold it until it is paid.

[7.] If the defendant in a judgment pays to the plaintiff the debt and costs due thereon, after notice from the attorney of the plaintiff, of his claim for

90          SUPREME COURT OF GEORGIA.

McDonald *et al. vs.* Leroy Napier.   Leroy Napier *vs.* McDonald *et al.*

costs, he pays in his own wrong, and will, notwithstanding such payment, be liable, on the judgment, to the attorney for his costs.

[8.] If there is a *bona fide* settlement between the parties, without notice of the attorney's claim for costs, he cannot proceed for them on the judgment; but if there is a fraudulent settlement made, with a view to prevent his getting his costs, between the parties, without notice, he can proceed on the judgment for his costs.

[9.] And if there be a collusive settlement of a pending cause, with a view to prevent the attorney from getting his costs, he is entitled to proceed in the cause, for the mere purpose of collecting his costs.

[10.] As against the plaintiff, an attorney has a *general* lien upon an execution, in his hands, and a special lien upon it, as respects the defendant. He can retain it, as against the plaintiff, for a general balance, and enforce it, by order of the Court, passed for that purpose, against the defendant, for his bill accruing in the cause.

[11.] Since 1832, in all the Courts of Common Law, in England, the attorney's lien prevails against the equitable right of set-off in the defendant. Formerly, in the Court of *Common Pleas*, the lien attached only upon the balance, after the equities between the parties were settled—so now in the Courts of Chancery. What is the rule in this particular in Georgia? *Query?*

[12.] The attorney's lien will not be suspended until an unliquidated claim, of the opposite party, can be ascertained, and a balance struck between the parties.

[13.] *Held,* that in Georgia, Attorneys and Solicitors have the same liens for their fees, whether agreed upon by express contract, or by implied contract, or determinable by the usage of the profession, which exist in England, in favor of attorneys and solictors, for their bills of cost.

[14.] A contract entered into between counsel for a plaintiff and the defendant to the judgment, by virtue of which, the defendant agreed to pay them a part of their fees in the case, in consideration of their release to him of the balance, and of their forbearance to press the execution, and of a delivery to him of the execution: *Held,* to be a valid contract; and that money paid upon the contract, cannot be recovered back from the counsel, although the judgment was, after the contract was made and executed, reversed.

Assumpsit, in Bibb Superior Court. Tried before Judge JOHNSON, May Term, 1853.

These two writs of error, being both taken from the same judgment in the Court below, were consolidated by consent of parties, and argued together. The following are the facts :

Charles H. Rice, as receiver of the assets of the Bank of Macon, obtained, in April, 1845, a decree in Chancery, in Twiggs Superior Court, against Edward Carey, assignee of the Bank of Columbus, and Leroy Napier security on appeal, for about 21,000 dollars, principal and interest.   On the 4th June, 1845, Napier, the security on appeal, to prevent a levy on his property, paid to the counsel of complainant in the cause, the sum of 3,000 dollars, taking the following receipt:

| | |
|---|---|
| CHARLES H. RICE, Receiver of the Assets of the Bank of Macon, *vs.* EDWARD CAREY, Assignee of the Columbus Bank, Principal, and LEROY NAPIER, Security on Appeal. | *Fi fa. in Twiggs Superior Court,* Oct. Term, 1845. |

Received from Leroy Napier, three thousand dollars, as security, in the above case, for the assignee, Edward Carey; which sum is to be applied to the fees of the undersigned in this case, with the understanding that we are not to hold Mr. Napier liable for the balance of our fees; and that we are to turn the *fi. fa.* over to him when he calls for it, to enable him to reimburse himself out of the principal; and if he should collect out of the principal more than sufficient to pay his demand, then the balance is to be turned over to us—at least so far as our fees are concerned, then remaining unpaid.

(Signed)                          A. P. POWERS.

A. P. POWERS for S. T. BAILEY &

C. J. McDONALD,

Attorneys for plaintiff in *fi. fa.*

JUNE 4, 1855.


Previous to this transaction, to wit, on the 10th March, 1845, Rice, the Receiver of the Bank of Macon, had executed to Leroy Napier, in consideration of the payment of three hundred and thirty dollars, a full release and discharge from all liabilty incurred as security on appeal, in said case; and on the 24th May, 1845, had executed another release, similar and

fully ratifying the former.    In 1846, Edward Carey, assignee of the Bank of Columbus, filed, in Twiggs Superior Court, his Bill of Review, seeking to set aside the decree obtained against him.    To this bill, a demurrer was filed, on the ground that no cause was shown why the former decree should be set aside; which was overruled, and the decree set aside.    A writ of error to the Supreme Court, taken from that decision, was dismissed, for non-joinder of parties.    The cause is still pending in Twiggs Superior Court.    In 1848, Leroy Napier brought his action in Bibb Superior Court, against A. P. Powers, S. T. Bailey, and Charles J. McDonald, to recover the sum of three thousand dollars, paid to them for fees, as above stated; and the foregoing facts were made to appear.    The Court charged the Jury, among other things, that the counsel in the case of Rice *vs.* Carey, and Napier, security, on appeal, were entitled to a lien on the judgment, for their fees; that a release from Rice to Napier could not affect the rights of the counsel, and could not release Napier from liability, as far as the fees were concerned; and that the payment of three thousand dollars, by Napier to the counsel, was a valid contract, and for a good consideration, if the judgment against Napier was a valid one. To this portion of the charge, the plaintiff excepted.

On the other hand, the Court charged, that if the judgment against Carey and Napier was void, and had been reversed, that Napier was entitled to recover back whatever he had paid on said judgment, whether to the plaintiff, or his attorneys—made no difference; and that if the Jury believed that said judgment had been reversed, and that the 3,000 dollars were still in the hands of the attorneys, Napier was entitled to recover it back from them.    To this portion of the charge, the defendants excepted.

The verdict of the Jury was for defendants.

*For Napier,* STUBBS & HILL, POE, NISBET & POE.

*For Bailey et al.* WHITTLE and S. T. BAILEY.

Messrs. POE, NISBET & POE submitted the following brief:

In this case, our objections to the rulings of the Judge, in the Court below, arise out of the last ground occupied by that Judge, in his charge to the Jury.

And we contend that he erred in ruling:

1st. That Rice and Napier, the parties to the execution, could not enter into a covenant, by which Rice could release Napier from all liability under said execution, even to the extent of the fees of Rice's counsel.

Parties to a suit may compromise or terminate it, without consulting their attorneys, provided they do it in good faith; and the attorneys must look to their clients for their costs. (*Hustin vs. Den,* 2 *Harr.* 438.)

The claims which an attorney may have on his client, for counsel fees, make no part of the attorney's lien upon the tried costs; or which this Court will protect against the interference of his client. (8 *John. Rep.* 259.    *The People vs. Horderbug,* 10 *Eng. Ch. Rep.* 173.    27 *Eng. Ch. Rep.* 419.)

As between the parties to a suit, an attorney has no lien for costs. The equities of the parties are superior to those of the attorney. (13 *Uland, The People vs. N. York C. P.* 654, 655.   6 *Eng. Ch. Rep.* 489.)

2. The Court erred in instructing the Jury, that the promise by the defendant, to Napier, to forbear to levy, and release him from further liability on the execution, and give him the control to reimburse himself, is a sufficient consideration for the payment of the $3,000.

The defendants, as counsel and attorneys, could not guaranty the plaintiff from a levy of the *fi. fa.*—it was alone in the power of the plaintiffs in execution. Nor could they release Napier from further liability on the *fi. fa;* nor even give a control of the *fi. fa.* to Napier, unless specially authorized by Rice, the plaintiff in execution; and this, by him, would have been an act of supererogation, as he had given a release.

And, as the execution was thus, as to Napier, *functus officio*, by the release, and actually unfounded, as since determined by the decision on the Bill of Review ; consequently there could arise no consideration from these sources, for the payment of the $3,000.    (2 *Case Rep. Herbert vs. Alexander*, 418, 422, *Lyon's opinion.*)

3. The Court erred in instructing the Jury, that if they found that such a contract as above referred to, was entered into by Napier and the defendants, they must find for the defendants.

The whole of the substance of this branch of the charge, is derived from the assumption that the attorneys had a lien on the judgment for their fees of every kind and description ; and that the plaintiff could not release the defendant from such liability.

But that defendants had no such lien, see authorities cited under 12th head.

The lien of the attorney only exists to the extent of the costs tried in the judgment.    (6 *Eng. C. L. Rep.* 489.    *Cross on Lien*, 34 *Law Library*, 148 *and* 152, *bottom page.*    1 *Bing. N. C.* 366, *Watson vs. Maskell.*

These costs are only those liabilities incurred by the attorney, in the prosecution of his client's cause.    (34 *Law Library*, 153, *Cross on Liens.*)

And it is quite competent for parties to settle their cases behind the back of their attorneys.    (34 *Law Library*, 154.    6 *Bing.* 568, *Nelson vs. Wilson.*)

*By the Court.*—NISBET, J. delivering the opinion.

[1.] On the trial of the cause below, the defendants there, and the plaintiffs in error here, Messrs. McDonald, Bailey & Powers, requested the Court to instruct the Jury, " that if they were the attorneys or solicitors of Rice, the plaintiff in the *fi. fa.* and Napier paid the money to them for Rice, as such attorneys or solicitors, without fraud, duress or mistake, they are not liable to be sued by Napier ; and if there was any fraud, du-

ress or mistake, he was bound to allege and prove it.    Judge *Johnson* declined to give the instruction asked; but after stating the case, and adverting particularly to the facts that the money paid by Napier to the plaintiffs in error, McDonald, Bailey & Powers, was paid by him as a defendant in a decree, which was afterwards reversed; instructed the jury, "that if the case stopped here, and there were no other facts involved, there is no doubt but that the plaintiff, Napier, would be entitled to recover; for there is no rule of law better settled, than that when an individual pays money upon a judgment, which is afterwards set aside, he may recover it back, in the form of action, which is here brought; and the same rule is equally applicable, when the money is paid to the agent of the plaintiffs in the judgment, if it still be in his hands, not paid over to his principal." Although, in No. 17, the plaintiffs in error make a number of assignments; yet they all grow out of the charge, as above requested, and as above given.    The case only requires the consideration of the question, did the Court, in his instruction, administer the law correctly?    The first proposition of the Court is true.    It is true, that when an individual pays money upon a judgment, which is afterwards set aside, he may recover it back, in an action for money had and received to his use. But we differ with the learned Judge, in the further statement, that if money be paid to the *agent* of the plaintiff in a judgment, which is afterwards set aside, the agent is liable for it in an action for money had and received, to the use of the payer. Our opinion is, that the agent, in such a case, is in no event liable; but the payer must look to the principal.    If it be true, that Napier paid the money to the plaintiffs in error, as the attorneys or solicitors of Rice, the plaintiff in the decree; then the plaintiffs in error are not liable to him; although the money be still in their hands, and the decree be reversed.

[2.] The rule is correctly stated, in the request of the plaintiffs in error.    It is a rule well settled in the Law of Principal and Agent.    If money be paid to any one, whether agent or not, by fraud or duress, the person receiving, is liable to refund it.    Fraud or duress, will make the receipt of the money

illegal; and it is in his hands, for the use of the payer.    He cannot in conscience, retain it—he cannot protect himself upon the ground of his being an agent; for the Law of Agency does not shelter either fraud or violence.    There is no pretence here, that the plaintiffs in error received this money from Napier fraudulently—none in the facts of the case, and none set up in the argument.    Nor can it be said, with the least possible degree of truth, that Napier entered into this agreement, and paid this money under duress.    *Duress* is of two kinds: 1st, duress of *imprisonment,* when a man actually looses his liberty; and 2d, duress, *per minas,* when a man is put in fear, by threats of loss of life, of loss of member, of mayhem, or of imprisonment.    (2 *Just.* 482.    1 *Black. Com.* 131.    2 *Rolls Abr.* 124. *Bacon's Ab. title Duress.    Foster's Crown Law,* 322.    2 *La Raymond,* 15, 78.)

Here the plaintiffs in error, representing a judgment against Napier, and having ordered a levy, agreed with him to forbear the levy, upon certain terms, upon his paying their fees as counsel in the case.    He voluntarily entered into the agreement; and although induced doubtless so to do, to avoid a levy, was not imprisoned or threatened with loss of life, loss of member, with mayhem or imprisonment.    It would be a novel judgment, to hold that a defendant, threatened with a levy, by virtue of a valid, subsisting execution, is under duress.

Another class of cases, in which an agent is liable, is where money is paid to him, to which his principal has no legal right; or where it is paid to him by mistake.    I have no doubt but that the presiding Judge fell into error, by not distinguishing between this class of cases, and the case before him.    The rule given to the jury, as applicable to this class of cases, however, is not laid down with sufficient fullness.    The rule is this, to wit: so long as the money has not been paid over by the agent to his principal; nor his situation altered, relatively to his principal, as touching that fund, it may be recovered from him.    Neither he nor his principal, is, in conscience, entitled to retain it; but, *ex equo et bono,* it belongs to the payer; and an action lies to recover it.    It is not the property of the

agent; and therefore he cannot retain it.    And it is not the property of the principal; and therefore, he does not hold it for the use of the principal.    He holds it for the use of him who illegally, or by mistake, has paid it.    The agent is not liable to the principal for it.    The equitable action for money, had and received for his use, will lie against the agent, to recover it back.    To charge the agent, it would seem not to be necessary for the payer to give notice to him not to pay over the money—inasmuch as his right of action does not depend upon the notice; but upon the illegality of its receipt.    (*See the Bank of the United States vs. The Bank of Washington,* 6 *Peters T. C. R.* 8 to 18.    *Hearsey vs. Pruyen,* 7 *Johns. R.* 179.)    But if notice be given before the money is paid over, and before the agent's situation is altered, he will be liable, even if he does pay it over, or his situation is afterwards altered. In the cases in the books, in relation to this matter, the controversy very often turned upon the question, what amounts to payment over; and what constitutes such an alteration of the situation of the agent, as will protect him?    I do not go into this inquiry, as this is not a case of money to which the principal was not legally entitled; nor did the agents exceed their authority in the receipt of it; nor was it paid to them by mistake, except so far as to say, that it is well settled that if before notice, the agent gives *fresh credit* to his principal, on the faith of the money received, his situation is altered, and he is not liable.    For the general rule, see *Paley on Agency,* by *Dunlap,* 388, *and notes.    Story on Agency,* §300.    3 *Chitty on Com. and Manuf.* 313.    2 *Liverm. on Agency,* 264 to 266. *Buller vs. Harrison, Cowp.* 565.    *Cox vs. Prentice,* 3 *M. & S.* 345.    1 *Taunton,* 359.    4 *Burrow,* 1987.    7 *Cowen,* 460. 5 *Taunton,* 815.

This case stands apart from fraud, duress, mistake, or want of legal right in the principal, to receive the money.    And we are clear, that if the recovery of the plaintiff below, depended upon the liability of the plaintiffs in error, *as agents,* he would be obliged to fail.    The decree was a valid, unimpeached recovery, in favor of Rice, the *Receiver of the Bank of Macon,*

98    SUPREME COURT OF GEORGIA.

McDonald *et al. vs.* Leroy Napier.    Leroy Napier *vs.* McDonald *et al.*

against Carey, and his security on the Appeal, Napier. Upon this decree, execution had issued and was in the hands of the plaintiffs in error, as Rice's solicitors. They had placed the execution in the hands of the Sheriff of Bibb county, with instructions to levy, when Napier and the plaintiffs in error came together, and it was agreed between them, (Judge Powers acting for himself, and also for Messrs. McDonald and Bailey,) that that if he, Napier, would pay on the judgment, as security aforesaid, the sum of $3,000, to be applied to their fees in the case, they would not hold him liable for the balance of their fees—would forbear a levy; and would turn over the *fi. fa.* to him, when he should call for it, to enable him to reimburse himself out of his principal, Carey; he agreeing also, that if he should collect out of Carey, more than sufficient to reimburse himself, then the balance was to be turned over to them, so far as their fees remained unpaid. In pursuance of this agreement, Napier executed his notes, payable severally to the plaintiffs in error, two for $1,250, and one for $500, at 6 months; and they delivered to him the execution, and released as to him, the balance of their fees. At maturity, the notes were paid. Sometime afterward, the decree was reversed; and Napier brought this action against the plaintiffs in error for the $3,000 paid under these circumstances. From all of which, it appears that the money was paid to them as the *solicitors* of the plaintiff, on a *subsisting judgment.* They were the agents of their client, Rice, to receive it. Notice being given of their claim for fees on this decree, before the release of Napier, it stood a valid judgment in Rice's favor, against Napier, to the extent of these fees; and the relation of client and attorney—that is, of principal and agent—still subsisted between Rice and these plaintiffs in error. The payment to them, therefore, was a payment to their principal. They, upon receipt of the money, became liable to account to their principal therefor; and to no other person. If liable to him, they cannot, at the same time, be liable elsewhere. The act of receiving the money was within the scope of their agency; it was, indeed, their duty as attorneys to represent the

judgment.   They owed no duty to Napier; and their act being the act of their principal, there was *no privity* between him and them.   If there was no privity, how, it may be confidently asked, can he maintain an action against them?   But it is said, that they became liable when, subsequently, the decree was reversed; that the reversal made the receipt of the money illegal, *ab initio;* and thereby, they became liable to Napier.   The receipt of the money being lawful, when it was made, it was a fact finished; and could not become unlawful by subsequent reversal.   At the time when the payment was made, Napier had no right of action against Rice, the principal, much less against his agents.   The reversal cannot have a retroactive operation, so as to make illegal that which was lawful when done.   It could not annihilate the relation of principal and agent, which then existed between the plaintiffs in error and their client, and create a privity between them and Napier, which at that time had no existence.   The only effect of the reversal was to give to Napier a right of action against Rice, which, until the reversal, he had not.   If it had become necessary to sell Napier's property under this execution, before it was reversed, it is not questionable but that the purchaser would have acquired a good title.   A party may justify, under an erroneous judgment, if there is a regular execution, until it is reversed.   (1 *Stra.* 509. 1 *Ver.* 195.   6 *Peters. T. C. R.* 15.)

[3.] All acts done under a judgment, are valid, as respects the rights of third persons, until reversed—that is, as respects third persons, rights and obligations are the same that they would be, if the judgment remains forever unreversed.   A contrary rule would tie the hands of all parties, and be exceedingly inconvenient.   No action would be taken upon the judgment, within the time allowed for a writ of error, for fear of a reversal and its consequences.   No question as to the effect of notice to the attorneys, of any invalidity in the judgment, or of an intention on the part of Napier, to apply for a reversal, is made in this case.   The record shows, conclusively, that he acted with his eyes open—that he recognized the judgment—

the amount claimed as fees; and that the payment was purely voluntary.

[4.] These principles are vindicated by authority. The case of the *Bank of the U. States vs. the Bank of Washington*, vindicates them. In that case, an execution in favor of Triplett & Neale, against the Bank of Washington, was put in the hands of the Cashier of the office of discount and deposit, of the U. S. Bank, at Washington, for collection; and the money paid thereon and applied to the uses of Triplett & Neale, according to their instructions. Afterwards, the judgment was reversed, upon writ of error, and the Bank of Washington brought suit for the money, against the Bank of the U. States. The Supreme Court held, that the Bank of the U. States was not liable; and that the recourse of the Bank of Washington, after the reversal, was upon the principals, Triplett & Neale. Mr. J. *Thompson*, who pronounced the judgment, says: "When the money was paid, there was a legal obligation, on the part of the Bank of Washington, to pay it; and a legal right on the part of Triplett and Neale, to demand and receive it, or to enforce payment of it under execution. And whatever was done under that execution, whilst the judgment was in full force, was valid and binding on the Bank of Washington, so far as the rights of strangers and third persons are concerned. The reversal of the judgment cannot have a retrospective operation, and make void that which was lawful when done. The reversal of the judgment gives a new right or cause of action against the parties to the judgment; and creates a legal obligation on their part, to restore what the other party has lost, by reason of the erroneous judgment, and as between the parties to the judgment, there is all the privity necessary to sustain and enforce such a right; but as to strangers, there is no such privity. *And if no legal right existed, when the money was paid, to recover it back, no such right could be created by notice of an intention to do so.*" (6 *Peters. T. C. R.* 18.) The only criticism that can be made upon this case, as distinguishing it from the case at bar, is, that the money had been applied by the agent to the uses of the principals, by their direction; and this

is answered by the ruling of the Court, that if the U. States Bank had been notified of an intention to recover back the money, even then, the Bank of Washington would have had no right of action against the Bank of the U. States. We have already seen, that when money has been *illegally* received, or paid by mistake, the agent is liable, after notice, even if he has paid it over. Not so, however, is the rule in this case. Here, notice has no effect; because there is no right of action against the agent at any time—his receipt of the money, for his principal, being lawful in the beginning. The case of *Colvin vs. Holbrook, in the New York Court of Appeals,* vindicates them so strongly, that the authority of that Court is obliged to be with us. That Court held, that an action will not lie against a Deputy Sheriff, to recover money rightfully received by him, in that character; although, on demand of him, whilst the money is yet in his hands, he refuses to pay it to the person to whom it rightfully belongs. Nor did they place their decision on the statutory or official character of the Deputy Sheriff; for they held, upon Common Law principles, after a close review of all the cases, "That a known agent, receiving money for his principal, in pursuance of a valid authority, without fraud, duress or mistake, is not liable to an action on behalf of a third person, who is ultimately entitled to the money, for neglecting to pay the same upon request; although the agent has not paid it over to his principal." *Gardiner, J.,* in this case, reviews the cases relied upon by counsel for the defendant in error, before us. Among them, *Hearsy vs. Pruyen,* 7 *Johns. R.* 128; the leading case, of *Buller vs. Harrison, Cowp.* 566; *Cox vs. Prentice,* 3 *M. & S.* 345; 10 *Peters. T. C. R.* 137, 155; *Miller vs. Aris,* 1 *Selwyn, N. P.* 103; *and Snowden vs. Davis,* 1 *Taunton,* 359; and shows that they were cases where the principal had no right to receive the money; or the money was paid by mistake; or where the agent exceeded his authority. (2 *Comstock's R.* 126.)

They are vindicated in *Costigan vs. Newland,* by the Supreme Court of New York, wherein the case from Comstock, (*ubi supra,*) is considered and affirmed. In Costigan *vs.* New-

land, an attorney, who had foreclosed a mortgage in favor of his client, and collected the money, was sued by the person having the oldest lien on the fund, for a balance remaining in his hands, after paying to his client the amount of his mortgage debt, and retaining the costs of the foreclosure.   The Court held, that he was the agent of his client, in collecting the money; and as such, not liable to suit, although the money still remained in his hands; and that the plaintiff's recourse was upon his principal.   (12 *Barbour's R.* 456.)   In *Sadler vs. Evans,* the action was brought against the agent of Lady Windsor, to recover back money paid to him for her use.   The Court of King's Bench, sustained a non-suit awarded below, saying, through Lord *Mansfield,* "The plaintiff ought not to recover against the defendant in this action—the action ought to have been brought against Lady Windsor herself, and not against her agent; this money was paid to the known agent of Lady Windsor.   He is liable to her for it, whether he has paid it over to her or not—he received it for her."   He said farther, "He kept clear of payments to third persons; but where it is to a known agent, in which case, the action ought to be brought against the principal, unless in special cases, (as under notice, or *mala fide.*")   (4 *Burrow,* 19, 86.)   I consider the case of *Stephens vs. Badcock,* tried before Lord *Tenterden, C. J.,* in the King's Bench, as strongly vindicating our judgment in this case.   Money was received by an attorney's clerk, and receipted for by him, for the attorney.   The client to whom the money belonged, brought an action for money had and received to his use against the clerk; and it was held by the Court, "That the action did not lie; for that the defendant received the money as the agent of his master, and was accountable to him for it; the master, on the other hand, being answerable to the client for the sum received by his clerk; and there was no privity between the present plaintiff and the defendant."   (3 *Barn. and Adol.* 354.   23 *Eng. C. L. R.* 93.)

We are content to rest our judgment on this assignment, upon the principles stated and the authorities quoted; but respect for counsel admonishes me, that a single view taken for

the defendant in error, remains to be noticed. The release, say they, of Napier by Rice, dissolved the relation of principal and agent, between the latter and his counsel; for after the release, Rice had no interest in the judgment against Napier, for them to represent. This being so, Rice had no right to the money paid to them; and they receiving it, without authority, are liable, even without notice, so long as the money remains in their hands. I have already said that the release being a nullity, as to the extent of the fees of the plaintiffs in error, the relations of the parties, as client and solicitors, continued, as to this transaction. But if it be as counsel consider it, then I say that plaintiffs in error are not liable; because, there being no notice to them, they are discharged, by a virtual payment of the money to Rice. The money was not literally turned over to him and handed back to them; but whilst the payment was a credit in Napier's favor, on the execution, it was also, in the very terms of the arrangement, a payment to them of fees to that amount, due to them by Rice, and a credit to him, Rice, for so much paid to them on account of fees. And directly to this point, see the case of *Mowats vs. McLelan,* when the retainer of a sum for fees, by counsel collecting it, was held equivalent to an actual payment over. (1 *Wend.* 173.)

For these reasons, the judgment of the Court excepted to in No. 17 is reversed.

The defendant below, Mr. Napier, dissatisfied with the decision of the Court against him, also sued out a writ of error; and he assigns for error, the instructions of the Court to the jury, that the defendants in error, Messrs. McDonald, Bailey & Powers, had, notwithstanding Rice's release, a lien upon the execution against Napier for their fees, which they could enforce upon him. That their right to enforce this lien, and their forbearance to do so, together with their discharge of Napier from further liability, for fees; and their delivery to him of the execution for his remuneration out of his principal, Carey, were sufficient consideration to support the contract between them

and Napier ; and therefore he could not recover back the money paid to them under that agreement.

The counsel for the plaintiff in error, joins issue with the presiding Judge on the attorney's lien, denying that in Georgia attorneys have a lien for any thing but the taxable costs, and asserting that in this case, they have no lien for that. If they are right in either of these propositions, the plaintiff in error is entitled to recover, because the contract between him and the defendants in error, can, we concede, be supported only upon their *right* of lien for their fees upon the execution. This is an important question, and is now before this Court for the first time.

The condition of the profession in Georgia is different in one important particular from what it is in most of the States, and differs *toto cœlo* in that particular from the condition of attorneys and solicitors in England. Here, no costs whatever, are allowed to attorneys, unless indeed it be the three dollars paid to the jury. So that although by Law, it is payable by the plaintiff, in the first instance, they are entitled, when advanced by them. Even that, however, is not due to them directly as attorney's cost; but being taxed in the bill of costs, is receivable by them, as costs due to their client, which having advanced, they are entitled to retain. (*Cobb's N. D.*, 353, 363.)

Lawyers in this State, are compensated by *fees* upon agreement with their client ; and in the absence of any special agreement, by an implied understanding to pay them a reasonable fee. Attorneys in England are paid by taxing in the bill of costs the cost fees allowed by law, and charges and disbursements made by them in and about the business of their clients. For these they are entitled to sue ; and have also by Statute, and the usage of the Courts, certain summary remedies in certain cases, as well as the *liens* to which I shall directly advert.— (*See Tidd's Practice as to Attorney's Bills,* 324 to 336) Nor have we in Georgia the grades in the profession, which obtain in England—to which several grades belong different duties, and appertain different rights. We know not the distinctions of Attorney, Advocate, Barrister, Sergeant, &c., to which so

great importance is attached in our fatherland.   Advocates or counsellors at C. Law cannot sue for compensation according to *Blackstone, Lord Mansfield and Lord Hardwick.*   The latter, in Thornhill *vs.* Evans, exclaims with holy horror, "Can it be thought that this Court will suffer a gentleman of the bar to maintain an action for fees, which is *quiddam honorarium?* (2 *Atk.* 332, *Black. Com.* 2nd vol. 24, 25.)

This *honorarium* is a voluntary donation, in consideration of services which admit of no compensation in money.   Advocates are deemed (God save the mark !) to practice for honor or influence.   And they were deemed so to do at Rome in the time of Cicero.   He held in small esteem the strictly legal profession, and declined a fee or present for prosecuting *Verres*, and twits *Hortensius*, for receiving an *Ivory Sphinx* for defending him. Yet the great Advocate of Rome grew rich on presents.   And so much was the bestowal of the *honorarium* abused in his day, that the Senate interfered and regulated the matter by a decree. Notwithstanding Lord Hardwick's exclamation, it is not questionable that lawyers in Great Britain above the grade of attorneys are better paid in money, and more liberally rewarded with honors, than in any other country.   Our professional brethren, however, need not be informed, that to realize the highest honors and the richest rewards of the British Bar requires industry, integrity, years of labor and profound science. And if the kind critic will pardon this *little* departure from the lean and bald condensation, which some hold to be necessary to a Judicial opinion, I will add, that the greatest of English lawyers was an accomplished scholar, and the most finished rhetorician of his day ; and so was Cicero in his day ; and so was Chancellor D'Aguesseau in his day ; and so also was LeGare in his day.   In this State, I believe that usage does recognize two designations of members of the bar—Attorneys and Solicitors, which implies, however, no distinction as to rights or obligations.   When in a Court of Law, we call them Attorneys ; when in a Court of Chancery they are called Solicitors.   By Statute, when a citizen is admitted to the Bar, he is admitted to practice in all the Courts of Law and Equity in

the State, and all who are admitted, are equally entitled to the privileges, and equally incur the obligations of the profession. (*Cobb's N. D.*, 89, 92.)   No qualification is prescribed by Law, but "moral rectitude," not even maturity as to age.   If the applicant can produce satisfactory evidence of moral rectitude and can sustain an approved examination in open Court, he is entitled to a commission to practice in the Courts of Law and Equity in this State.   It is in the Act of 1847, that the Law recognizes all who are admitted as attorneys, when it declares, that any person who is a citizen of the State, may on application to a Judge of the Superior Court, be admitted to practice as an attorney in the Courts of Law and Equity in this State. (*Cobb's N. D.* 92.)   The same recognition is found in the Act of 1806.   (*Cobb's N. D.* 89.)   Thus, we see that attorneys here are the attorneys and advocates of the Common Law:— And so far as our condition, and the character of our institutions will admit, an attorney becomes, by admission to the bar, entitled to the privileges which belong to the different grades of the profession in England.   He is entitled, therefore, to the liens which exist at C. Law, in favor of attorneys.   It becomes necessary now to inquire what those liens are.

[5.] Certain things in relation to the attorney's lien, are to be considered as settled in England.   And first, It is settled that he has a general lien for the amount of his bill upon the deeds, papers and writings of his client which come to his hands in the course of his professional employment, although his demand does not arise from services in relation to those papers.   Until this bill be paid, the Court will not order them to be delivered up; nor will trover or detinue lie for them.   This lien is, however, only commensurate with the right which the party delivering the papers has in them.   If the delivery is unauthorized, the attorney cannot detain them.

[6.] He also has a special lien upon the money of his client, which may come into his hands, and upon a judgment procured by him for his client.   If the money is in his hands, he may retain it in satisfaction of his bill; and if in the hands of the officers of the Court, the Court in the exercise of its equitable

power (I mean a Court of Law) will lay hold of it, and prevent its payment over, until his lien is satisfied.

[7.] If the defendant pays to the plaintiff the debt and costs due on a judgment, after notice from the attorney of the plaintiff not to do so, he will pay it in his own wrong, and is liable to pay to the attorney his fees notwithstanding.

[8.] A settlement between the parties, with a view to defraud the attorney out of his fees, will not discharge the defendant from liability to pay them, or extinguish the judgment as to them, even without notice; yet, if the parties without notice, *bona fide* settle or compromise the debt and costs, the attorney cannot afterwards proceed against the defendant for his costs.

[9.] And in case of a collusive settlement of a cause, the attorney may proceed in the cause for the mere purpose of obtaining his costs. · These propositions, I am clear, may be considered as settled Law in England; and have been recognized as Law very generally in our States. They are settled equally in the Courts of Law and Chancery.

[10.] The lien on the money of a client is limited to the bill of costs accruing to the attorney or solicitor in the case in which it is raised, and the lien on a judgment is in like manner restricted. An execution issued upon a valid judgment in the hands of the attorney, is a paper belonging to the client, upon which a lien for a general balance will attach, as well as upon any other paper. At the same time, it is to be noted, that the security which the execution gives for fees, is not the mere right of detention until they are paid, but a process available for their collection out of the defendant. I do not see why it should not be detained as against the plaintiff for a general balance, whilst it is clear that in case of a settlement by the defendant with notice, or without it collusively, the judgment cannot be enforced against him for more than the fees due in the particular case. It is important too, that in reference to the lien of the attorney on the judgment, his power over it should be well understood. Because he has the lien stated, it is not to be understood that it supercedes all control which the plaintiff has over it, and that the attorney as *dominus*

108    SUPREME COURT OF GEORGIA.

McDonald *et al.* *vs.* Leroy Napier.    Leroy Napier *vs.* McDonald *et al.*

*litis*, can "marshal the proceedings on the judgment or execution, as he may think fit." The lien amounts to this: that he has a right to control it for the collection of fees through an order of the Court directing its use for that purpose in the exercise of an equitable power which appertains to it over its own process and over the lien of its officers. So in this case, I apprehend that the attorneys could not levy this execution *in invitum* as to the plaintiff Rice, upon the property of Napier for their fees, without an order of Court. (*Barker vs. St. Quenlin*, 12th *Meeson & Welsby*, 440, 5 *Taunton* 429.)

That the lien of the attorney upon a judgment is restricted to the costs of the particular suit, see *Tidd's practice* 338, 3 *Barn. & Cress* 535, 5 *Dowel. & Ryl.* 399 *S. C.*, 4 *Bing.* 17, *S. C.*

[11.] There is not a uniform practice in the different Courts of Great Britain, upon the question whether the attorney's lien is subordinate to the right of set-off in the defendant to the judgment. Some of them holding that the lien overrides the defendant's equity in that regard, and others, that it only attaches upon any balance that may remain after all the equities between the parties are settled.

In the King's Bench the former rule prevails. (*Tidd's Practice* 338, 4 *Durnford and East* 123 4, 6 *Ibid* 456, 8 *Ibid* 70, 1 *Maul & Selw* 240, 8 *Taunt* 526, *Montague on Liens* 59 to 63.)

In the Courts of Chancery, and formerly in the Common Pleas, the latter. (*Taylor vs. Popham* 15 *Vesey* 79, *Ex parte Rhodes* 15 *Vesey* 541, 2 *Black R.* 826, 1 *H. Black R.* 23, 217, 2 *Bos. & Puller* 28, 4 *Taunt* 320, 8 *Ibid* 526, 4 *Bing.* 16, 1 *Price* 376, 2 *Ball & Beat.* 34.)

Since 1832, however, the practice has been uniform in all the Courts of Common Law in Great Britain, for at the Hilary Term of that year, by virtue of the statute which authorizes the Judges of those Courts to make rules with a view to uniformity in practice, they adopted a rule allowing the lien. (4 *Bligh, N. S.* 604, 1 *Dowl. Pr. Cas.* 196, 3 *Idem*, 638.)

In New York, I do not consider that the rule is very certainly settled. The old practice of the Court of Common Pleas in

England has certainly been adopted, so far as all the equities between the parties are concerned, which grow out of the case in which the lien of the attorney originates.   But Chancellor Walworth, in two cases, has decided that *other* equities give way to the lien, and he also insists that no other rule than that has ever been adopted by the Courts of that State.   In *Dunkin vs. Vanderbug*, he decided, that a party, against whom a decree for costs had been made, will not be permitted to sett off against such costs a decree or judgment in his favor in relation to a distinct matter to the prejudice of the Solicitor's lien.— But when different claims arise in the *same suit*, or in relation to the *same matter*, they may be arranged and set off agreeably to equity, without reference to the lien of the Solicitor.   (1 *Paige's R.* 622.   3 *John's R.* 247, also to the same effect, 4 *Paige* 647.   2 *Caine's R.* 105.   See also in favor of the general equities against the Solicitor's lien.   (6 *John's Ch. R.* 317. 8 *John's R.* 357.   16 *Wend.* 446.)

[12.] Chancellor Kent, who adopted the rule of the Common Pleas, however, held that the solicitor's lien for costs will not be suspended until an unliquidated claim of the opposite party can be ascertained, and a balance finally struck between the parties.   (6 *John's Ch. R.* 317.)

There being no equities set up in this record by the defendant in the execution against the plaintiff Rice, this question does not arise ; and as the Court expressed no opinion on it, I shall express none for myself.   As to the general lien of the attorney upon the papers of his client and his special lien on money and judgments, see *Story on Agency* §383.   2 *Sch. & Lefroy* 279. *Ex parte Sterling* 16 *Vesey* 259.   *Ex parte Pemberton* 18 *Vesey* 282.   *Stevens vs. Blacklock* 1 *M. & S.* 535.   *Hollis vs. Claridge* 4 *Taunt.* 807.   *Montague on Lien* 59 to 67.   *Smith on Mercantile Law* 338, 339.   2 *Bell Com.* §796.   2 *Kent's Com.* 640.   1 *Hoffman's Ch. Pr.* 34, 35,   12 *Wend.* 261.— 15 *Johns* 405.   1 *Cowen* 172.   4 *Ibid* 416.   *Turn. & Russ.* 304.   2 *Keen* 181.   *Sausse & Sc.* 634.   9 *Sim.* 508.   *Paley on Agency*, by *Dunlap* 131 *note A*.   *Cr. & Ph.* 458.   6 *Madd. R.* 93.   1 *Russ. & M.* 361.   4 *Myl. & Cr.* 354.   3 *Smedes*

*& Marsh.* 214.    32 *Law Library* (*Cross on Lien* 147.)    10 *Verm. R.* 184.    6 *Price* 203.    1 *Douglass* 238.    *C. T. R.* 361.    3 *Atk.* 720.    3 *Barn & Cress.* 534.    10 *E. C. L. R.* 245.

The allowance of the Attorneys' and Solicitors' liens in the Courts of Great Britain, seems to have originated there at no very early day as a matter of practice.    Lord *Mansfield* somewhere says (I think it is in *Wilkins vs Carmichael, Douglas* 97) That he himself had argued the right of the attorney to his lien in a Court of Chancery, and it does not therefore date farther back than his day.    He says farther in the case last referred to, that it "Was established on general principles of justice."    Lord *Kenyon* said in *Read vs. Dupper*, "The principle has been long settled, that a party should not run away with the fruits of a cause, without satisfying the legal demands of his attorney, by whose industry and expense those fruits were obtained."    (6 *Term R.* 361.)    Gradually the practice of the Courts, founded on principles of justice, took the form of a fixed principle of the Common Law, and now the Attorney's lien is as firmly seated in English jurisprudence as any other. But it is insisted that in England the lien exists only as security for the *costs* which by Law are taxable in the course of the business of the Attorney, and has never been extended to any *compensation* other than that, and can be extended here no farther.    Upon this reasoning lawyers in Georgia have no lien whatever ; for with us they are entitled to no costs.    But I do not understand it to be limited in England to *legal* costs.    It exists there, for the Attorney's bill, and that is made up of his fees ascertained by Law, and his disbursements and charges on account of his client.    If the idea of the Counsel was true as to the limitation in England, I should find no difficulty in extending the lien to the fees of Counsel in Georgia.    The rule which secures *legal costs* where legal costs are provided by Law as a *compensation*, will by an irresistible implication, secure the compensation agreed upon by the parties, where none is provided by law.    *Disbursements*, however, come in under the lien in England, and although these are made to constitute a part

of the Attorney's bill, yet stand upon a different footing from the costs which the Law provides as a compensation. They are claims standing in account, against the client, and if for them the lien prevails, why should not a claim for services rendered, be also covered by the lien?

[13.] Upon the analogy of the law of this lien, fees agreed upon by express or implied contract with the client, are protected under the Common Law in Georgia. It is not true, however, that the lien in Great Britain grows out of the fact that the Law there makes provision for the compensation of the Attorney. Whatever may have been the view which British lawyers primarily entertained of this lien, it now rests upon higher and firmer ground. It rests upon that principle of justice and right upon which any other lien is sustained. It is a security for a debt. The particular lien which the Attorney holds upon a judgment is as strong an equitable title as the assignment of a chose in action. He occupies the position of an assignee of the judgment. See Lord *Mansfield* and Judge *Spenser* to this point in *Martin vs. Hawks*, 15 *John's R.* 405. In a late case, Lord *Cottenham*, speaking of the general lien of the Attorney upon the papers of his client, takes the ground that there is no difference between that and any other security for a debt, and that there is no distinction in the law of lien between that of a Solicitor and that of any other party. His language is, "I can not see how there can be any sound distinction between the case of a Solicitor, claiming a lien on the papers of his client, and the case of any *other creditor* who holds a security for his debt. It was suggested at bar that the existence of a special contract would make a difference; but there is in fact no ground for such a distinction. Liens existing by the custom of trade or the practice of a profession are equivalent to contracts—and I know of no distinction in the law of lien between that of a Solicitor and that of any other party." *Paley on Agency, by Dunlap* 132. *Note. Richards vs. Platel, Cr. & Ph.* 457.) Here, then, are the true grounds. Attorneys and Solicitors are upon the footing of creditors, and their lien is upon the footing of securities. And

there is no difference between the lien of Attorneys and Solicitors, and the lien of any other persons.    Their liens are upon the footing of factors and other agents' liens.    And as these hold liens not only for charges and disbursements, but also for compensation, either fixed by the usage of trade or by agreement, so also have Attorneys and Solicitors liens for their compensation, whether that compensation be settled by the Law, in the form of costs, or be agreed upon by the parties, or determined by the established usage of the profession.    Doubtless the lien of an Attorney may be waived as other liens of like character may be.    (2 *Kent's Com.* 640.  *Story on Agency* 378 *to* 381.)    Such are the conclusions to which we have arrived upon this subject.    And with such views, the ruling of the Judge as to the contract between Napier and the defendants in error, must necessarily be sustained.    If they had a particular lien upon this judgment, by virtue of which they were entitled to enforce it against him for their fees, then forbearance to press it, was a good consideration.    And although it be true, as I have before said, that an order of Court would be necessary to enable them to use the execution, yet the *right to use it at all*—the existence of the lien—is sufficient consideration to support the contract.    A contract which recognizes and extinguishes a legal right, is a valid contract.

[14.] Napier recognized the right, and agreed to pay the three thousand dollars in satisfaction, under a release of the balance of what was due to them, they stipulating at the same time to deliver the *Fi. Fa.* to him, that he might reimburse himself out of Carey.    The *Fi. Fa.* was delivered, and in our judgment his claim to recover back the money paid according to the stipulations of this contract, is without grace, and without legal right.    The reversal of the judgment does not affect the contract—it was a valid judgment at the time it was entered into.    It is said that a part of the consideration moving from them to Napier has failed, and therefore the plaintiff's action ought to be sustained—and the position is sought to be sustained thus:  The defendants in error stipulated to transfer the execution to Napier, that he might indemnify himself by a

levy upon the property of his principal: when the judgment was reversed, the execution became a nullity, and therefore the consideration of the contract failed. But this will not do for several reasons. It might be sufficient to say, that the defendants in error made no guarantee of the perpetual validity of the judgment. They only stipulated to *deliver* the execution to him when he should call for it; and it was delivered to him. Again, it was a subsisting regular process when he received it, and its annihilation by a reversal of the judgment, was not caused by any act of theirs —the movement to reverse it must needs originate with the parties bound by it, to wit, Napier, and his principal, Carey; and it did originate with them, and when it was reversed by a dismissal of the writ of error before the Supreme Court, it was so reversed because Mr. Napier voluntarily declined becoming a party to that writ of error. In the whole matter he was presumed to be cognizant of his legal rights—he was cognizant of the facts upon which they depended—he admitted the amount claimed by them for their fees, and is most clearly forever concluded. The release made to him before the judgment was made impotent by the judgment, and the subsequent release had no effect upon the lien of the counsel, because made after notice. Number 24 is affirmed, and the judgment of the Court below, in the cause stands affirmed; the costs abiding the judgment of this Court upon each writ of error.